1   Elizabeth H. Potter (Oregon Bar # 105482) *pro hac vice*
2   Sarah K. Stellberg (Idaho Bar # 10538) *pro hac vice*
    **ADVOCATES FOR THE WEST**
3   P.O. Box 1612
    Boise, ID 83701
4   (208) 342-7024
5   epotter@advocateswest.org
    sstellberg@advocateswest.org
6
7   Adriane J. Hofmeyr (AZ Bar # 025100)
    **Hofmeyr Law PLLC**
8   31 N. 6th Avenue, Suite 105-466
    Tucson, Arizona 85701
9   (520) 477-9035
10  filings@hofmeyrlaw.com
11  *Attorneys for Plaintiffs*
12              **IN THE UNITED STATES DISTRICT COURT**
13                 **FOR THE DISTRICT OF ARIZONA**
14
15  CENTER FOR BIOLOGICAL            No.
    DIVERSITY, SIERRA CLUB, and
16  WILDEARTH GUARDIANS,
17         Plaintiffs,                        **COMPLAINT**
18  vs.
19
20  RAYMOND SUAZO, in his official
    capacity as the State Director, BLM
21  Arizona State Office; DAVID
    BERNHARDT, in his official capacity as
22  Secretary of the Interior; and BUREAU OF
    LAND MANAGEMENT,
23
24         Defendants.
25
26

COMPLAINT– 1

**INTRODUCTION**

1.      This case challenges the Bureau of Land Management's (BLM) decision to issue oil and gas leases in Navajo and Apache Counties, Arizona during September 2018 without ever analyzing the impacts of these leases on local communities, public lands, wildlife, and the environment.

2.      These leases—the Coconino Aquifer Leases—cover land parcels near rural towns, the Navajo Nation, Petrified Forest National Park, the Coconino aquifer, and the Little Colorado River.  As the most productive aquifer in northern Arizona, the Coconino aquifer provides industry, land owners, businesses, and municipalities with a dependable supply of water.  Millions of downstream water users rely on the Little Colorado River, which flows into the Grand Canyon and feeds the Colorado River.

3.      The reasonably foreseeable impacts of oil and gas development on the leased parcels are staggering.  Such development will divert millions of gallons of water from limited local supplies, produce significant quantities of air and water pollution, destroy and degrade the landscape and wildlife habitat, and industrialize this quiet, rural area.  In turn, these impacts will increase the risks of toxic spills, water contamination, and adverse health effects on nearby residents, and will harm wildlife and the people who use and enjoy the lands in the area.

4.      BLM refused to consider these and other potential impacts before issuing the challenged leases.  Instead, the agency relied on a thirty-year-old environmental analysis that did not anticipate oil and gas development, and did not take a hard look at

COMPLAINT– 2

such impacts or the significant new information that has arisen about the local environment, wildlife, new oil and gas technologies, and climate change.  In so doing, BLM violated the National Environmental Policy Act (NEPA) and the Federal Land and Policy Management Act (FLPMA).  Plaintiffs thus ask this Court to find that the BLM's issuance of the Coconino Aquifer Leases was unlawful and vacate the leases.

## **JURISDICTION AND VENUE**

5.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including NEPA, 42 U.S.C. § 4321 *et seq*., FLPMA, 43 U.S.C. § 1701 *et seq*., the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq*., the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., and the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*.  An actual, justiciable controversy exists between the parties, so the requested relief is proper.  28 U.S.C. §§ 2201–02; 5 U.S.C. §§ 701–06.

6.     The challenged agency actions are final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, and 706.

7.     Plaintiffs have exhausted all required administrative remedies.

8.     Venue in the District of Arizona is appropriate under 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claim occurred here, and Plaintiff Center for Biological Diversity resides in Tucson, Arizona.

9.     Plaintiffs in this action are as follows: Center for Biological Diversity, Sierra Club, and WildEarth Guardians.

COMPLAINT– 3

A.     CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a non-profit membership corporation founded and headquartered in Arizona, with offices and staff in many other states and Mexico. The Center works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center is actively involved in species and habitat protection issues worldwide, including throughout the western United States, and continues to actively advocate for increased protections for species and their habitats in Arizona.  The Center has over 61,000 members, including those who reside near or use the area on or adjacent to the leased parcels in Apache and Navajo counties for recreational, scientific, educational, and other pursuits and intend to continue to do so in the future, and are particularly interested in protecting the many native, imperiled, and sensitive species and their habitats that may be affected by the Coconino Aquifer Leases.  These members engage in activities such as hiking, photographing, and wildlife viewing for recreational, aesthetic, scientific, conservation, professional, health, and other purposes, and intend to continue doing so. The Center brings this action on its own behalf and on behalf of its adversely affected members.

B.     SIERRA CLUB is a national nonprofit organization of approximately 780,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these

COMPLAINT– 4

objectives. The Sierra Club's Arizona Chapter, known as the Grand Canyon Chapter, has approximately 16,000 members, including members who live and recreate in the state. Sierra Club members use the public lands in Navajo and Apache Counties, including the lands and waters that would be affected by actions under the Coconino Aquifer Leases, for quiet recreation, aesthetic pursuits, and spiritual renewal. These areas would be threatened by increased oil and gas development that is likely to result from the challenged leases.

C.    WILDEARTH GUARDIANS is a nonprofit environmental advocacy organization dedicated to protecting and restoring the wildlife, wild place, wild rivers, and health of the American West. Guardians is based out of Santa Fe, New Mexico but maintains offices across the West, including in Tucson, Arizona. On behalf of its 231,342 members and supporting activists across the West, including 277 in Arizona, Guardians works to ensure that the federal government genuinely considers all of the impacts of its oil and gas leasing decisions, including impacts to our climate, air quality, water, and wildlife.

10.    Plaintiffs protested the September 2018 oil and gas lease sale challenged in this case on behalf of their members and supporters who live and recreate on and near the challenged parcels.

11.    Plaintiffs and their members have been and will continue to be harmed by BLM's decision to issue the Coconino Aquifer Leases without analyzing the impacts of oil and gas development on the environment.  The challenged leases are likely to allow

COMPLAINT– 5

the construction and operation of oil and gas wells that will degrade the surrounding public lands, water, air, wildlife, wildlife habitat, and general environment.  Such impacts will harm Plaintiffs' members' use and enjoyment of the public lands, wildlife habitat, natural areas, waterways, air, and general environment in areas that are affected by the Coconino Aquifer Leases.

12.     Plaintiffs and their members are also harmed by BLM's Coconino Aquifer Leases because the agency denied them accurate and sound science, environmental analyses that fully disclose the impacts of oil and gas activities, and other information related to the organizations' mission and their members' interests in the area.  The denial of this information prevented and continues to prevent the Plaintiffs from fulfilling their missions to learn about and disseminate information regarding the impacts of federal decisions on wildlife and habitat, and to use that information to advocate on behalf of their members' interests.  Unless the relief prayed for herein is granted, Plaintiffs and their members will continue to be harmed by the challenged decision.

13.     Defendant RAYMOND SUAZO is sued in his official capacity as State Director of BLM's Arizona State Office.  Director Suazo is responsible for overseeing the agency's activities within Arizona, including decisions from the Safford Office that issued the challenged leases.

14.     Defendant DAVID BERNHARDT is the Secretary of the Interior and is sued in his official capacity.  Secretary Bernhardt is the official ultimately responsible

COMPLAINT– 6

under federal law for ensuring that the actions and decisions of BLM comply with all applicable laws and regulations.

15.     Defendant U.S. BUREAU OF LAND MANAGEMENT is the agency within the Department of the Interior directly responsible for carrying out the Department's obligations under statutes and regulations governing oil and gas exploration, leasing, and development, and for applying and implementing the federal laws and regulations at issue in this Complaint.  BLM is the agency that issued the Coconino Aquifer Leases that are challenged in this case.

## LEGAL FRAMEWORK

**National Environmental Policy Act (NEPA)**

16.     NEPA is "our basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  Its twin aims are: (1) to foster informed decision making by requiring agencies to consider the environmental impacts of their proposed actions; and (2) to ensure that agencies inform the public that they have considered environmental concerns in their decision making.

17.     To accomplish these objectives, NEPA requires federal agencies to prepare an Environmental Impact Statement (EIS) to consider the effects of each "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)(i).

18.     To determine whether the impacts of a proposed action are significant enough to warrant preparation of an EIS, the agency may prepare an Environmental

Assessment (EA). 40 C.F.R. § 1508.9. The EA must take a "hard look" at those impacts and include "brief discussions of the need for the proposal, of the alternatives . . . , [and] of the environmental impacts of the proposed action and the alternatives." *Id*. § 1508.9(b).

19.     If, after preparing an EA, the agency determines an EIS is not required, it must issue a Finding of No Significant Impact or "FONSI" explaining why the project's impacts are insignificant. *Id.* §§ 1501.4, 1508.9, 1508.13.

20.     An assessment of whether or not an impact is "significant" must consider the "context and intensity" of the impact. *Id.* § 1508.27. "Context" refers to the setting of the proposed action and "intensity" refers to the severity of the impact. *Id.* § 1508.27(a).

21.     "Intensity" must be evaluated with a host of factors in mind, including but not limited to "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas[,]" "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial[,]" "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks[,]" "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts," "[t]he degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources[,]" and "[t]he degree to which the

COMPLAINT– 8

action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973." *Id.* § 1508.27(b).

22.     An agency must also "[r]igorously explore and objectively evaluate all reasonable alternatives," including a "no action" alternative. *Id.* § 1502.14; *see also id.* § 1508.9(b). This analysis of alternatives is the "heart" of NEPA review. *Id*. § 1502.14

23.     NEPA review must occur at the earliest possible time and prior to any "irreversible, irretrievable commitment of resources."

24.     Oil and gas leasing without a No-Surface Occupancy (NSO) stipulation—a stipulation that prohibits occupancy or disturbance on the land surface—is an irretrievable commitment of resources.

**National Historic Preservation Act (NHPA)**

25.     The National Historic Preservation Act (NHPA), 54 U.S.C. §§ 300101–320303, formally recognizes historic preservation as an important policy of the United States.

26.     The heart of the NHPA is Section 106, which seeks to protect America's heritage by requiring federal agencies to take into account the effect of their "undertakings" on historic properties. *See* 54 U.S.C. § 306108; 36 C.F.R. pt. 800. A "historic property" is "any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places" (National Register). 36 C.F.R. § 800.16(l)(1); 54 U.S.C. § 300308.

COMPLAINT– 9

27.     To initiate this so-called "Section 106" process, the responsible agency must determine whether the proposed federal undertaking "is a type of activity that has the potential to cause effects on historic properties," assuming historic properties are present.  36 C.F.R. § 800.3(a). This is a categorical determination focused on the type of activity at issue, rather than actual on-the-ground conditions. An "adverse effect" is defined broadly to include direct, indirect, and cumulative adverse effects to the characteristics of a historic property that make it eligible for listing on the National Register, including a site's setting and feeling. *Id.* § 800.5(a)(1). Examples of adverse effects include the "lease . . . of property out of Federal ownership or control without adequate and legally enforceable restrictions or conditions to ensure long-term preservation of the property's historic significance." *Id.* § 800.5(a)(2).

28.     If the agency's undertaking is the type of activity that could affect historic properties, the agency must initiate consultation with the appropriate State Historic Preservation Officer (SHPO), Native American tribes, and other interested parties. *Id.* § 800.3. In consultation with these parties, the agency must delineate an "area of potential effects" (APE) for the undertaking, identify listed or eligible historic properties within the APE, and determine whether the proposed undertaking may adversely affect the identified historic properties. *Id.* §§ 800.3 – 800.5. If the agency official concludes that there may be an adverse effect, it must consult further in an effort to resolve the adverse effects. *Id.* §§ 800.5(d)(2), 800.6.

COMPLAINT– 10

29.     The Section 106 process concludes with an agency determination of "adverse effect" or "no adverse effect." *See id.* § 800.5(d). The agency must document and invite consulting party comments regarding their finding. *Id.*

30.     BLM may enter into agreements with an SHPO, pursuant to 36 C.F.R. § 800.14, regarding the manner in which BLM will meet its obligations under the NHPA. BLM executed a State Protocol Agreement with the Arizona SHPO in 2014 which governs certain elements of the Section 106 process.

31.     BLM must complete this Section 106 process "prior to" committing itself to a course of action that might affect historic properties.  54 U.S.C. § 306108.

**Oil and Gas Leasing on Public Lands**

32.     The Mineral Leasing Act (MLA), 30 U.S.C. §§ 181–287, authorizes the Secretary of the Interior to offer certain federal minerals for lease, including oil and gas. The Secretary has delegated this authority to BLM for onshore minerals.  *See* 43 C.F.R. § 3100.0-3.

33.     Under the MLA, BLM manages oil and gas drilling on public lands using a three-stage process: (1) land-use planning, (2) parcel nominations and leasing, and (3) permitting of parcel exploration and drilling.

34.     In the first phase, BLM prepares a Resource Management Plan (RMP) in accordance with FLPMA, 43 U.S.C. § 1712, and FLPMA's planning regulations, 43 C.F.R. Part 1600.  RMPs generally define the allowable uses of the public lands in the planning area, including which lands may be leased for oil and gas development and

COMPLAINT– 11

under what conditions.  An RMP does not mandate leasing any specific lands.  BLM must prepare an EIS under NEPA that evaluates the expected environmental impact of potential land management decisions made in RMPs, including oil and gas development. 43 C.F.R. § 1601.0-6.

35.     In the second phase, companies typically nominate public lands for inclusion in an upcoming competitive lease sale through submission of "expressions of interest."  BLM reviews the nominated parcels to determine which parcels to include in the sale. This review process can result in parcel rejections, deferrals, and/or stipulations being placed on the leases to protect the environment or other resource values.  *See id.* § 3101.1-3.

36.     The MLA vests BLM with considerable discretion to determine which lands will be leased and does not obligate BLM to offer public lands that operators have nominated.

37.     BLM then offers its chosen parcels in quarterly, competitive lease auctions, in accordance with 43 C.F.R. Part 3120.  If a parcel is nominated and brought to the lease sale but receives no bids, it can be leased non-competitively for two years after the sale. *Id.* § 3110.1. Once issued, a lease is valid for 10 years but can be held indefinitely if it is producing oil or gas "in paying quantities."  *Id.* §§ 3120.2-1; 3107.2-1.

38.     The issuance of a lease generally gives the lessee a right to use some of the land for oil and gas development.  *Id.* § 3101.1-2.  Issuing leases therefore limits BLM's ability to prohibit oil and gas development altogether on the leased land.

COMPLAINT– 12

39.     In the third and final phase, the lessee submits an application for a permit to drill (APD) to BLM prior to drilling. *Id.* § 3162.3-1(c).  BLM may impose conditions of approval (COAs) on drilling permits to address site-specific concerns.

40.     Under the MLA, the federal government reserves the right to extract helium from gas produced on leased federal lands in accordance with the Department of the Interior's regulations.  30 U.S.C. § 181.  Those regulations require any applicant to agree not to develop oil and gas wells "with the principal purpose of recovering the helium component of natural gas" without express permission from the Secretary of the Interior.  43 C.F.R. § 16.3.

**Federal Land and Policy Management Act (FLPMA)**

41.     FLPMA directs BLM to manage the public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use."  43 U.S.C. § 1701(a)(8).

42.     FLPMA requires BLM to manage public lands under its jurisdiction in accordance with principles of multiple use and sustained yield. *Id.* § 1732(a). To do so, the agency must develop RMPs and then conform all resource management decisions to such plans.  *Id*. § 1712; 43 C.F.R. § 1610.5-3(a).

COMPLAINT– 13

**Administrative Procedure Act (APA)**

43.     Judicial review of agency actions under NEPA and FLPMA are governed by the APA, which provides a right to judicial review for any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702.  Review under the APA is further limited to "final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

44.     The APA directs courts to "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). Agency actions may also be set aside where the action is "without observance of procedure required by law." *Id.* § 706(2)(D).

## FACTUAL BACKGROUND

**The Communities and Natural Resources of the Holbrook Basin**

45.     The land parcels at issue in this case are located in Apache and Navajo Counties within east-central Arizona about 100 miles east of Flagstaff, and about 160 miles southeast of Grand Canyon National Park.  The area falls within the Holbrook Basin and Little Colorado River Valley along the southern edge of the Colorado Plateau and north of the Mogollon Rim.

46.     The following map identifies the location of the parcels in red:

COMPLAINT– 14



47.    This area sits at high elevations above 4,000 feet and consists largely of undeveloped, rolling plains with jutting buttes.  Desert grasslands, sagebrush, and pinyon-juniper vegetation communities predominate.  The climate is semi-arid, with annual precipitation averaging roughly 12 inches or less.

48.    This area is rural and includes a mix of BLM, state trust, National Park, and private lands in a checkerboard ownership pattern.  The Navajo Nation and the Hopi Tribe's reservations are located directly north of the leased parcels, while the White Mountain Apache Tribe's reservation is located to the south.

COMPLAINT– 15

49.     The Apache County parcel includes privately-owned surface lands.  It is located about five miles east of Petrified Forest National Park, is adjacent to the Navajo Nation, and intersects with the Puerco River, Interstate 40, and the Santa Fe railroad.

50.     The Navajo County parcels are located on BLM lands a few miles from Woodruff, a town of less than 200 people, and 15 miles southeast of Holbrook, a town of about 5,000 people.  These parcels intersect with the Little Colorado River and Silver Creek and their confluence and are not located near existing oil and gas wells.

51.     The Little Colorado River originates in the White Mountains near New Mexico and flows hundreds of miles into Grand Canyon National Park, draining a watershed of approximately 27,000 square miles or nearly 20% of Arizona.  It ultimately feeds the Colorado River—and the millions of people who depend upon it for drinking water and other uses.  Historically, the river was perennial, but impoundments, diversions, and decreasing groundwater levels have caused most stretches to run intermittently, leaving only its headwaters and lowest reaches flowing year-round.  The largest tributary of the Little Colorado River is Silver Creek.

52.     The Puerco River is a tributary of Little Colorado River.  It is ephemeral and generally holds surface flow after spring precipitation and snow melt, or flash floods during summer monsoon rains.  Riparian areas along the river support wetlands and provide important habitat for native plants and animals.  The National Park Service reports that the Puerco River has exceeded recommended drinking water and acute

freshwater standards for arsenic, lead, copper, zinc, uranium, and radium 226 where it intersects with the park.

53.     The Coconino aquifer—called the C-aquifer—underlies this area and most of the Colorado Plateau, and is the most productive aquifer in the Little Colorado Basin and Northern Arizona.  The C-aquifer feeds and sustains nearby waterbodies such as the Little Colorado River and its tributaries and springs in the bottom of the Grand Canyon.

54.     Numerous municipalities in Arizona such as Flagstaff, industrial users, residents, and agricultural operators depend upon wells that draw water from the C-aquifer.  The nearby city of Holbrook relies entirely on groundwater pumped from the C-aquifer.

55.     Dozens of groundwater wells in or near the leased parcels are owned by local residents, tribes, the state land department, BLM, the National Park Service, ranchers, and others.  Thus, preservation of the quantity and quality of the aquifer is important for local communities.

56.     The C-aquifer already faces serious quality and quantity problems, and threats are increasing.  The water table of the aquifer ranges from a few hundred feet to more than 1,500 feet, but it is migrating deeper—possibly the result of drier climate trends—and forcing those who rely on it to drill deeper to obtain water.  As water resources dry up with climate change and drought conditions, demand to pump groundwater is increasing.  Groundwater in some wells near the leased parcels already does not meet drinking water standards.  Two major power generating stations in the area

COMPLAINT– 17

withdraw such extensive amounts of groundwater that the National Park Service has expressed concerns about the security of the long-term supply for future operations of Petrified Forest National Park.  Interest in potash mining in the area also threatens supplies due to the large quantities of groundwater such mining requires and its potential to contaminate water and cause adverse, long-term effects.

57.    Climate change models predict that the Colorado Plateau will become more arid with droughts becoming more severe and potentially longer lasting.  This is likely to compound the existing problems with the water quantity and quality of the C-aquifer and other nearby water sources.

58.    The Little Colorado River and Silver Creek provide habitat for the Little Colorado spinedace, a fish species that is listed as threatened under the Endangered Species Act (ESA).  The yellow-billed cuckoo and the Mexican wolf are other ESA-listed species in the area.

59.    Other wildlife that inhabit the area include pronghorn antelope, elk, mule deer, coyotes, desert cottontails, doves, American beaver, Mexican vole, prairie rattlesnake, common lesser earless lizard, Painted Desert whiptail lizards, Hopi rattlesnakes, several bird species, and species of concern to BLM and the State of Arizona such as the Little Colorado sucker and the bluehead sucker.

60.    Petrified Forest National Park is located just a few miles away from the Apache County parcel.  This Park holds petrified trees that are more than 210 million years old and houses one of the largest and most colorful deposits of mineralized wood in

COMPLAINT– 18

the world.  Such petrified wood is valued as a semi-precious gemstone and as a scientific resource for paleontologists.  Congress protected this Park to preserve, protect, and provide opportunities to experience globally significant Late Triassic paleontological resources, nationally significant archeological sites, and scenic and natural resources, including the Painted Desert, and to foster scientific research and public understanding and appreciation of park resources.

61.     The Park and surrounding area hold innumerable archaeological resources, including several that are listed on the National Register of Historic Places and thousands of petroglyphs that document sociopolitical boundaries of the traditional cultures in the area, solar calendars, and more.  Some artifacts date back 8,000 years while others may be from only 600 years ago.  A rare Chacoan Culture Great House that is approximately 1,000 years old is located within the Park boundaries.  There is the potential for other archeological resources to exist in the surrounding area, but the extent to which such resources have been surveyed, protected, or degraded on private, state, and BLM land is unclear.  In particular, the Puerco River drainage likely holds archeological sites.

62.     Petrified Forest National Park has exceptionally clean air and expansive, colorful landscapes that create distinctive scenic vistas.  However, regional haze from sources outside the park are degrading visibility and affecting how far and well visitors can see these vistas.  The Park Service reports that even low levels of air pollution affects ecological and human health, scenic views, and visitor enjoyment.

COMPLAINT– 19

63.     About 645,000 people visit Petrified Forest National Park each year, making it an economic driver in the region that provides a cumulative economic impact of more than $45 million and hundreds of jobs in this rural area.  People visit the Park to backpack, camp outside of the park, bicycle, hike, ride horses, visit wilderness areas within, and engage in other recreational pursuits.

64.     People use other public lands near the parcels for similar recreational activities like camping, horseback riding, off-road vehicle use, hiking, shooting, and biking.  The leased parcels and surrounding area also provide opportunities for hunting pronghorn antelope, elk, mule deer, and doves, and fall within the Arizona Game and Fish Department's Game Management Units 2A and 3A.  Other land uses in the area include livestock grazing on nearby BLM lands.

65.     The region also holds a number of other National Register-eligible historic properties, including windmills, railroad cars, residential and other structures, the historic Route 66 highway alignment (with original paving on parts), and the historic Woodruff Snowflake Bridge over the Little Colorado River.

66.     Overall, the area includes important resources and rural communities that are threatened by oil and gas development through the Coconino Aquifer Leases.

**Oil, Gas, and Helium Exploration in the Holbrook Basin**

67.     Historically, oil and gas exploration and production in Arizona, including on BLM lands, has been relatively limited.  Between fiscal year 2008 and 2017, BLM

issued only 7 new leases in the entire state during just two years—2013 and 2015.  But during that same time, BLM reported no oil and gas production on any leases in the state.

68.     Two recent developments have spurred much greater interest in oil and gas exploration within the Holbrook Basin.

69.     First, recent advancements in oil and gas drilling techniques such as hydraulic fracturing and acidizing have made extraction possible or economically viable in areas where it previously was not.

70.     Hydraulic fracturing, also known as "fracking," is a well-stimulation technique that requires the injection of thousands or millions of gallons of water per well along with chemicals under high pressure into underground rock layers to fracture the oil and gas producing formations.  In recent years, technological developments have allowed operators to employ this technique with horizontal drilling and with higher volumes of water to increase the quantity of oil and gas extracted from wells.

71.     Acidizing is similar to hydraulic fracturing—but requires significantly greater concentrations of chemicals.  This involves injecting acid into the ground to maintain surfaces and equipment, to remove blocked pathways or increase rock permeability, or to increase production.

72.     These unconventional techniques have led to a dramatic increase in the production of commercial quantities of oil and gas in the country and the state on non-federal lands in recent years.  Such techniques have facilitated the extraction of

COMPLAINT– 21

commercial quantities of oil and gas from the nearby Dineh-bi-Keyah field—the most productive in the state.

73.     Second, industry interest in the Holbrook Basin—which has among the highest helium gas concentrations in the world—is increasing as natural gas demand and prices rise.  Helium gas may be extracted as a byproduct of natural gas processing. Companies are acquiring the rights to explore for and extract helium gas on state and private lands in the area, and beginning such activities. Because the MLA reserves all helium produced from federal lands to the government, 30 U.S.C. § 181, federal leases and permits cannot be granted for the primary purpose of helium production, absent permission from the Secretary of Interior, 43 C.F.R. § 16.3. However, helium produced as a byproduct of natural gas extraction may be sold pursuant to a contract with the BLM, subject to federal royalties. *See* 43 C.F.R. Part 16; 43 C.F.R. § 3103.3-1(d).

74.     The company that purchased two of the challenged leases—a Canadian mining company, Desert Mountain Energy—has already discovered seven helium deposits within the 36,000 acres of state land that it leases nearby.  The company's CEO has explained that the "Holbrook Basin has the potential to be one of the world's leading sources of helium…."  The company announced its acquisition of the Coconino Aquifer leases are for helium, oil and natural gas development and that it intends to explore for helium on the parcels.  The company's website describes the leases as "[s]trategic [h]elium [l]eases."

COMPLAINT– 22

**BLM's Phoenix District Resource Management Plan**

75.     BLM's Phoenix District RMP governs the agency's management of the areas that are leased for oil and gas development through the Coconino Aquifer Leases.

76.     BLM issued a Proposed Phoenix District RMP and accompanying Final EIS (RMP EIS) in December 1988, and adopted the RMP in a Record of Decision (ROD) issued in fall 1989.

77.     The RMP guides BLM's management of 911,000 acres of public land in two distinct geographic regions of Arizona.  This includes 229,000 acres of scattered public land in Apache and Navajo counties.

78.     The RMP left the entire planning area open to leasing of minerals like oil and gas.  However, the RMP "determined that future exploration and development of leasable minerals in the RMP area is only a remote possibility."

79.     Due to the low likelihood of such leasing, the RMP EIS included no analysis of potential impacts from any oil and gas development.

80.     Instead, the RMP stated: "[s]hould exploration and/or development of leasable resources be pursued during the life of this RMP, special stipulations will be incorporated into the lease agreement after the results of site-specific environmental assessments for each action are known."  The RMP further explained "BLM would prepare a site-specific environmental analysis before actions in the approved RMP are implemented."  This "would provide a site-specific assessment" of the potential impacts to wildlife, plants, cultural resources, water quality, air quality, and more if the agency

COMPLAINT– 23

1  implemented such actions.  The agency stated it would conduct such future analyses for

2  actions "that are not specifically identified" therein—like specific oil and gas leases—

3
4  through an EA or an EIS under NEPA.

5          81.     The agency echoed this requirement for future analyses throughout the

6  RMP.  In the wildlife and special status plant section, the agency explained that

7  "[p]otential impacts to wildlife and special status plants are analyzed in an environmental

8
9  assessment for each project and protection measures may be stipulated in the decision

10  record."  For soil, water, and air resources, the agency explained that measures to protect

11  such resources "would be brought forward in project planning and NEPA review."

12  Similarly, the agency explained that impacts to water would be "prevented or reduced"

13
14  through mitigative measures identified in project planning and NEPA compliance.

15          82.     The ROD reiterated the RMP EIS's conclusions, explaining that "[a] site-

16  specific environmental analysis will be prepared before actions in the RMP are

17  implemented.  The analysis will assess the significant impacts on affected environmental

18
19  elements including cultural resources and special status wildlife and plants. . . . The

20  analysis will identify mitigation, if necessary, to reduce the impacts of implementing an

21  approved action."  For actions not "specifically identified" in the RMP, the ROD

22  promised they would be "analyzed through an environmental assessment or an EIS …."

23

24

25

26

COMPLAINT– 24

**BLM's Approval of and Public Participation in the Coconino Aquifer Leases**

83.     In spring 2018, BLM accepted two sets of expressions of interest in oil and gas leases within Apache and Navajo counties and began preparing to offer these leases through a competitive sale.

84.     BLM prepared two Determinations of NEPA Adequacy (DNAs) that concluded the agency did not need to conduct any environmental analysis prior to conducting such an oil and gas lease sale.

85.     The DNA for Apache County—dated April 24, 2018—found that the 1988 EIS prepared for the Phoenix District RMP included an adequate analysis of the environment impacts and alternative actions for the Coconino Aquifer Leases.

86.     The Apache County DNA stated that "there would be no new direct or indirect impacts outside of those previously considered in the Phoenix RMP and Final EIS for making subsurface minerals available for lease."  It also explained that "[n]o new environmental concerns, interests, etc. are known that would impact the germane aspects of the RMP such that new alternatives would need to be considered."

87.     The Apache County DNA stated that the agency's archaeologist concluded "tribal consultation was adequate for the Phoenix RMP" and thus no new consultation was needed.  The agency's wildlife biologist "concluded that no new sensitive (threatened, endangered, candidate, or special status) species have been added to the area of interest since it was analyzed in the Phoenix RMP."  It also stated that there are "no

immediate environmental justice concerns due to the relative remoteness of the area in question."

88.     The Apache County DNA also determined that public involvement and interagency review for the RMP EIS that BLM prepared in 1988 was adequate for the Coconino Aquifer Leases.  On this point, it stated that "[t]here are no known concerns about oil and gas exploration in the area of interest."

89.     The DNA for the leases in Navajo County—dated May 8, 2018—included nearly verbatim determinations as the Apache County DNA.  It stated that there are no new environmental concerns, that past consultation was adequate, that no alternative actions needed to be considered, and that existing environmental analyses and public involvement for the RMP EIS were adequate.

90.     The DNA for Navajo County also admitted that the parcels are within the geographic range of three species that are listed by BLM as sensitive—Little Colorado spinedace, Little Colorado sucker, and bluehead sucker.  It did not acknowledge that the spinedace is listed under the ESA, or identify other listed species in the area that may be affected by the leases.

91.     Both the Apache and Navajo County DNA concluded that the Coconino Aquifer Leases conformed to the 1989 RMP and that the RMP EIS "fully covers the proposed action and constitute[s] BLM's compliance with the requirements of NEPA." Both also asserted that the agency would complete subsequent NEPA analyses of any APDs.

COMPLAINT– 26

92.     On June 15, 2018, Congressional Representative Tom O'Halleran sent a letter to BLM expressing concern about the agency's interest in offering an oil and gas lease sale "extremely close" to Petrified Forest National Park and the Little Colorado River.  Congressman O'Halleran explained the Park is a "unique geological, archeological, and paleontological treasure" whose protection has received bipartisan support for decades.  He thus urged BLM to "halt all activity related to the sale."  But if the agency moved forward with leasing, he requested that the agency fully study any impacts to the park and provide "robust public participation" opportunities.

93.     On July 2, 2018, the Center for Biological Diversity, Sierra Club, and WildEarth Guardians, along with their allies, sent a letter to BLM expressing similar concerns about BLM's plans to offer an oil and gas lease sale in Arizona.  These conservation groups urged BLM to suspend any further action in support of this lease sale.  They also urged BLM to, at a minimum, conduct a full environmental analysis of oil and gas development prior to conducting any lease sales.

94.     On July 23, 2018, BLM provided official notice of its intention to hold a competitive oil and gas internet-based lease sale for three land parcels totaling 4,101.70 acres in Apache and Navajo counties, Arizona on September 6, 2018.

95.     The notice informed the public that any administrative protests of the agency's decision to conduct the September 2018 lease sale were due within 10 business days—by 4:00 p.m. MST on August 2, 2018.

COMPLAINT– 27

1    96.    Plaintiffs Center for Biological Diversity, the Sierra Club, and WildEarth

2    Guardians, along with their allies—White Mountains Conservation League, Living

3    Rivers and Colorado Riverkeeper, Grand Canyon Trust, Food and Water Watch, and

4    Western Watersheds Project—timely filed a protest of that decision.  The National Parks

5    and Conservation Association also filed a protest of that decision.

6

7    97.    BLM reported that it received 361 protests of the lease sale.

8    98.    BLM denied these protests—without notifying the Center and others—and

9    held the oil and gas lease sale on September 6, 2018.  The agency received bids of

10   $10,960.00 for two of the three parcels totaling 3,040 acres.

11

12   99.    Congressman O'Halleran followed up with a letter to BLM on September

13   7, 2018, expressing his "grave concern and frustration" with the agency's decision to

14   pursue the leases without "critical public input" or "a full examination of the potential

15   impact to the water supply for millions of people."  In that letter, he noted that over

16   80,000 people protested the lease sale, despite the limited window for public

17   participation.  He expressed disappointment in the Administration's "unilateral decision"

18   to move forward with the lease sale in the face of "overwhelming opposition from the

19   American people."

20

21   100.   On November 5, 2018, BLM issued a non-competitive lease for the third

22   parcel in Navajo County that intersects with Silver Creek and the Little Colorado River.

23   101.   As noted above, BLM did not send a letter denying the Center's protest

24   until November 5, 2018, nearly two months after BLM offered the Coconino Aquifer

25

26

COMPLAINT– 28

Leases.  Defendant State Director Raymond Suazo denied the protest.  He relied on the

DNAs that the agency prepared in spring 2018.

102.   Prior to issuing the Coconino Aquifer Leases, BLM failed to prepare any

environmental analysis or review of the ecological impacts of its decision under NEPA

to lease these public lands prior to awarding the leases; the agency prepared no

environmental impact statement, no environmental assessment, and no categorical

exclusion.  Instead, the agency relied on two DNAs that determined no NEPA analysis

was required.

103.   The leases included stipulations for ESA purposes and cultural resources,

but did not include an NSO stipulation prohibiting all surface disturbance or occupancy.

**BLM Ignored Impacts of Oil and Gas Leasing**

104.   The Coconino Aquifer Leases give the lessees the right to use the parcels in

Navajo and Apache counties for oil and gas development, subject only to reasonable

conditions that BLM may impose at the APD stage.  Under these leases, the lessees have

the right to explore for oil and gas for at least ten years and to extract indefinitely if

production is occurring.

105.   By relying on two DNA worksheets, rather than an EA or EIS, to fulfill its

NEPA duties for the Coconino Aquifer Leases, BLM failed to consider the numerous

foreseeable impacts of oil and gas development on environmental and cultural resources,

including those described below.

COMPLAINT– 29

1

2

3

4

5

6

7

8

9

10

     106.    Oil and gas development requires the construction of wells and drilling pads that disturb and clear vegetation.  New road networks, pipelines, and powerlines often must be constructed and maintained to access these sites.  At the production stage, additional facilities such as well heads, separator units, and storage tanks must often be installed at wells to extract oil and gas.  Production also creates large quantities of wastewater that are often stored in reserve pits on site and then disposed of in evaporation pits or injected back into the ground.  Each of these steps requires heavy truck traffic to move and haul people, rigs, fracking chemicals, water tanks, and other equipment.

11

12

13

14

15

16

17

18

19

     107.    These activities can significantly impact local communities and wildlife. Construction activities typically strip away natural vegetation, resulting in habitat loss or fragmentation, soil erosion and sedimentation, and loss of other ecological values. The presence of industrial facilities can also degrade the scenic qualities of a landscape, and thus opportunities for recreational and aesthetic enjoyment. Electric lights and gas flaring can interrupt dark nighttime skies. The industrial noise associated with construction, drilling operations, and associated traffic can drown out natural sounds.

20

21

22

23

24

25

     108.    Water quantity and quality impacts are also a threat, especially where oil and gas extraction relies on newer technologies like hydraulic fracking and acidizing— both of which are likely to be used for development of these parcels. These technologies require staggering quantities of water, which may further deplete the C-aquifer, dewater adjacent water wells, or reduce flows in nearby surface waters. These production

26

COMPLAINT– 30

techniques also generate pollutants and wastewater which can contaminate water supplies through surface spills or migration of injection liquids into groundwater.

109.    Air pollution will likely be a major impact of oil and gas development on the leased parcels.  Vehicles, equipment, wells, and other oil and gas activities or infrastructure can emit air pollutants during drilling and production of wells, construction of well pads and roads, operations and maintenance, and venting and flaring.  Such emissions can include several types of pollutants, including volatile organic compounds, diesel exhaust, methane, nitrogen oxides, fugitive dust, particulate matter, ozone precursors, and airborne soil particles.  In turn, this air pollution can degrade visibility and impact human health.

110.    Moreover, oil and gas extraction, processing, transportation, and combustion release substantial quantities of greenhouse gases.  BLM has estimated that development and production of a single well in other areas may directly and indirectly emit hundreds or thousands of metric tons of carbon dioxide equivalent emissions per year.  In turn, these emissions will contribute to climate change and exacerbate its effects within the Holbrook Basin.

111.    For these and other reasons, oil and gas development on the Navajo and Apache County parcels threatens the health and well-being of residents of Woodruff, Holbrook, the Navajo Nation and Hopi Reservation, and beyond.  These communities may be affected by toxic air pollution, smog, water contamination, water consumption, increased traffic, new roads, noise and light pollution, and other effects.

COMPLAINT– 31

112.    Industrial development of the lease parcels may also impact the experience of the roughly half a million annual visitors to Petrified Forest National Park. Light pollution may compromise the park's recognition as an International Dark Sky Park status, a designation reserved for parks with "exceptional" and well-preserved night sky resources. The National Park Service is already concerned about air quality in the area, and additional air emissions may further interfere with the public's use and enjoyment of the area by, for example, decreasing visibility of vistas on the Colorado Plateau.  These and other impacts from industrial oil and gas activities may harm the public's enjoyment of this National Park, its wilderness area, and the unparalleled paleontological and archeological resources within.

113.    Wildlife impacts are also a concern.  The construction and operation of wells will destroy and fragment habitat and potentially impede migratory pathways. Increased noise, traffic, and human presence may also impact wildlife behavior and movement. Groundwater depletion, and the risks of wastewater or chemical spills, also threaten wildlife that depend on the water resources in the area.

114.    BLM is aware of these potential impacts, and the agency has routinely analyzed and disclosed these impacts in EAs and EIS when issuing oil and gas leases in other areas across the American West.

115.    Nevertheless, BLM never analyzed and disclosed the potential and likely impacts of oil and gas development on the leased parcels, nor analyzed and disclosed alterative actions that may have less or no impact on the environment, before holding the

COMPLAINT– 32

lease sale in September 2018.  BLM did not include stipulations or mitigation measures based on site-specific analyses.

116.    On information and belief, BLM never formally consulted under the NHPA nor agreed with the Arizona SHPO to follow alternative procedures under the State Protocol Agreement.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Violation of NEPA)

117.    Plaintiffs incorporate by reference all preceding paragraphs.

118.    NEPA requires the preparation of an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An agency may prepare an EA to determine whether an EIS is required.  Either way, the agency must take a "hard look" at the consequences, environmental impacts, and adverse effects of their proposed actions, consider alternatives to the proposed actions, and evaluate mitigation measures.  42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.1, 1502.14, 1502.16.

119.    BLM's issuance of the Coconino Aquifer Leases was a major federal action significantly affecting the quality of the human environment that required the agency to comply with NEPA.

120.    BLM's issuance of the Coconino Aquifer Leases also constituted an irreversible and irretrievable commitment of resources because BLM did not include lease stipulations that provide absolute protection against surface-disturbing activity.

COMPLAINT– 33

121.   BLM violated NEPA when issuing these leases by:

    a.  Failing to prepare an EIS, or an EA to determine whether an EIS was required;

    b.  Failing to consider alterative actions—including a no-action alternative—to the leases that were issued;

    c.  Failing to take a hard look at the potential direct, indirect, and cumulative impacts of the leases; and

    d.  Failing to provide adequate notice and an opportunity for the public to comment on the leases prior to their issuance.

122.   BLM did not fulfill its NEPA obligations by preparing two DNAs.  Both DNAs arbitrarily concluded that a thirty-year old EIS for the Phoenix District RMP sufficiently analyzed the effects of the leases.  That RMP EIS did not take a hard look at the impacts of, or alternatives to, the Coconino Aquifer Leases, and did not consider significant new information about the area, wildlife, cultural and natural resources, and the impacts of oil and gas development.

123.   Both DNAs also erroneously concluded that BLM may defer additional environmental analysis until it issues an APD.  At that point, the agency cannot comply with NEPA's requirement to consider a no-action alternative or meaningful mitigation measures because the agency lacks post-leasing authority to deny an operator the right to use or develop the leased lands, or to impose new conditions beyond reasonable measures.

COMPLAINT– 34

124.   For these reasons, BLM's issuance of the Coconino Aquifer Leases without preparing an EA or EIS was arbitrary, capricious, and not in accordance with NEPA and its implementing regulations.

125.   BLM's decisions constitute final agency actions that are reviewable by this Court under the APA, and must be held unlawful and set aside under 5 U.S.C. § 706.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## SECOND CLAIM FOR RELIEF
### (Violation of NHPA)

126.   Plaintiffs incorporate by reference all preceding paragraphs.

127.   Section 106 of the National Historic Preservation Act (NHPA) requires federal agencies to evaluate any "undertaking" that may affect historic properties in accordance with a mandatory consultation process.  54 U.S.C. § 306108; 36 C.F.R. Part 800.

128.   The sale of oil and gas leases is a federal undertaking with the potential to affect historic properties. As such, it is subject to the requirements of Section 106 of the NHPA.

129.   BLM violated these obligations by failing to undertake a Section 106 process before issuing the Coconino Aquifer Leases and by failing to comply with the Arizona State Protocol Agreement. BLM thus entirely failed to consider the potential effects of its lease sale on historic properties located in and around the lease parcels.

COMPLAINT– 35

130.   For this reason, BLM's issuance of the Coconino Aquifer Leases was arbitrary, capricious, and not in accordance with the NHPA, its implementing regulations, and the State Protocol Agreement.

131.   BLM's decisions constitute final agency actions that are reviewable by this Court under the APA, and must be held unlawful and set aside under 5 U.S.C. § 706.

WHEREFORE, Plaintiffs pray for relief as set forth below.

**THIRD CLAIM FOR RELIEF**
**(Violation of FLPMA)**

132.   Plaintiffs incorporate by reference all preceding paragraphs.

133.   FLPMA requires BLM to conform all resource management authorizations or actions to the applicable RMP.  43 U.S.C. §§ 1712, 1732(a); 43 C.F.R. § 1610.5-3(a).

134.   The Phoenix District RMP provided that BLM would analyze the environmental impacts of any actions it took to implement the RMP.  The RMP explained that BLM would conduct such analyses in an EA or EIS under NEPA, and consider the impacts of such actions on air and water quality, soil resources, wildlife, cultural resources, and plants.

135.   The RMP provided that BLM would incorporate special stipulations "into the lease agreement after the results of site-specific environmental assessments for each action are known."  Accordingly, the RMP required BLM to complete environmental analyses before issuing leases and to include special stipulations within the leases.

136.   Before issuing the Coconino Aquifer Leases, BLM completed no environmental analysis that considered these factors and included no special stipulations

that were based on any environmental analysis for the area.  Instead, the agency arbitrarily concluded in the DNAs that the 1989 RMP and 1988 EIS provided an adequate analysis of such impacts.

137.    For all these reasons, BLM's approval of the September 2018 lease sale without completing any environmental analyses and incorporating site-specific stipulations into the leases was arbitrary, capricious, and not in accordance FLPMA and its implementing regulations.

138.    BLM's decisions constitute final agency actions that are reviewable by this Court under the APA, and must be held unlawful and set aside under 5 U.S.C. § 706.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court grant the following relief:

(1)    Declare that BLM violated NEPA, NHPA, FLPMA, and/or their implementing regulations in issuing the Coconino Aquifer Leases;

(2)    Declare unlawful and vacate the Decision Record for the Coconino Aquifer Leases and DNAs;

(3)    Reverse and set aside any leases, permits, or approvals issued in reliance on the foregoing Coconino Aquifer Lease documents or decisions;

(4)    Enter such preliminary and/or permanent injunctive relief as Plaintiffs may pray for hereafter;

COMPLAINT– 37

(5)      Award Plaintiffs' costs incurred in pursuing this action, including

attorney's fees, as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d),

and other applicable provisions; and

(6)      Grant such other and further relief as the Court deems just and proper.

Dated: July 15, 2019                          Respectfully submitted.

/ s/Elizabeth H. Potter
Elizabeth H. Potter (OSB Bar # 105482)
Sarah Stellberg (ID Bar # 025100)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83702
(208) 724-2142
epotter@advocateswest.org
sstellberg@advocateswest.org

/s/Adriane J. Hofmeyr
Adriane J. Hofmeyr (AZ Bar # 025100)
Hofmeyr Law PLLC
31 N. 6th Avenue, Suite 105-466
Tucson, Arizona 85701
(520) 477-9035
filings@hofmeyrlaw.com

Attorneys for Plaintiffs

COMPLAINT– 38